Peter Strojnik, 6464
THE LAW FIRM OF PETER STROJNIK
3030 North Central Avenue, Suite 1401
Phoenix, Arizona 85012
Telephone: 602-524-6602
Facsimile: 602-297-3176
E-mail: Strojnik@aol.com
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Dial Up Services, Inc., dba Simple.Net, an
Arizona Corporation

        Plaintiffs,

   vs.

The State Of Oregon; The State Of Idaho;
The State Of North Dakota; The State of
Missouri; The Honorable David E. Reich,
Judge of the South Central Judicial District
of the State of North Dakota; Honorable
Kathryn Sticklen, Judge of the Fourth
Judicial District of the State of Idaho;
Various States of the United States I –
XXX,

        Defendants.

NO.  CV07-423-PHX-EHC

**PLAINTIFF'S AND PLAINTIFF'S
COUNSEL'S RESPONSE TO VARIOUS
MOTIONS FOR SANCTIONS**

**AND**

**MOTION FOR 28 U.S.C. §1927 AWARD OF
ATTORNEY'S FEES**

(Oral Argument Requested)

## SUMMARY OF RESPONSE

Defendants State of Idaho, Honorable Judge Sticklen, the State of North Dakota, and

Honorable Judge Reich ("Complaining Defendants") accuse Plaintiff and Plaintiff's counsel of

violating Rule 11 of the Federal Rules of Civil Procedure. In addition, the State of North

Dakota accuses Plaintiff's counsel of violating 28 U.S.C. §1927.

Complaining Defendants supporting arguments, however, misstate the standard for

imposition of sanctions under both Rule 11, see *Buster v. Greisen*, 104 F.3d 1186, 1190 (9th

Cir. 1997) and 28 U.S.C. §1927 see *In re Keegan Mgmt. Co., Securities Litig.*, 78 F.8d 431, 435

(9th Cir. 1996). This leaves Complaining Defendants' argument with a single substantive

contribution: By seeking affirmative relief, Complaining Defendants waived their personal

jurisdiction defense. *Dow Chemical Co. v. Calderon*, 422 F.3d 827, 831 (9th Cir. 2005) ("Personal jurisdiction exists where a defendant also independently seeks affirmative relief ...before the same court concerning the same transaction or occurrence. Such action 'may take place prior to the suit's institution, or at the time suit is brought, or after suit has started.' *Interpole* 940 F.2d at 22 [*General Contracting & Trading Co. v. Interpole, Inc.,* 940 F.2d 20 (1st Cir. 1991), (internal citations omitted)"]

The Declaration of Thomas L. Kummer, Esq., and the Affidavit of Peter Strojnik filed herewith conclusively establish that Counsel for Plaintiff reviewed several hundreds of reported decisions and spent at the minimum 150 hours in factual and legal research prior to commencing the present litigation. Counsel for Plaintiff spent numerous hours discussing the Complaint with independent counsel. Following a thorough and complete review of the facts and the law, and after consultation with independent counsel, Plaintiff brought the action against Defendants for injunctive and declaratory relief. Plaintiff and counsel *specifically* decided not to bring a claim for damages (conspiracy and extortion) against the Consortium of States pending further discovery in this matter.

By intentionally filing their Motions using the wrong legal standard, the attorneys for Complaining Defendants have subjected themselves to sanctions pursuant to 28 U.S.C. § 1927. Plaintiff requests that sanctions be imposed against Defendants in the amount of $7, 525.00[1].

This Response if more fully supported by the following Memorandum of Points and Authorities that is by this reference incorporated herein.

---

[1] See Affidavit of Peter Strojnik filed herewith.

## MEMORANDUM OF POINTS AND AUTHORITIES

Complaining Defendants advance no argument in opposition to Plaintiff's substantive position: that no State or State Court may collaterally attack a federal judgment dealing with interstate commerce. Complaining Defendants know, or should know, that the Supremacy clause, the Interstate Commerce Clause and the US District court's *exclusive* jurisdiction over Plaintiff's method of marketing signal a death knell to their unconstitutional attacks on Plaintiff's (now voluntarily ceased) method of marketing. Defendant's Motions for Sanctions do no more than reargue the previously filed Motions to Dismiss. They offer no new insight on the issues previously briefed "ad nauseam [sic]"[2].

### *The Standard for Imposition of Sanctions – Rule 11*

In *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002), the Court stated the standard for imposition of sanctions where the primary focus is the Complaint:

> Where, as here, the complaint is the primary focus of Rule 11 proceedings, a district court must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually "baseless" from an objective perspective, and (2) if the attorney has conducted "a reasonable and competent inquiry" before signing and filing it. (Citation omitted)

None of the briefs submitted by the Defendants references the *Mattell* standard. Defendants do not seem to recognize that the term "frivolous" is a shorthand term "to denote a filing that is *both* baseless *and* made without a reasonable and competent inquiry." (emphasis supplied) *Moore v. Keegan Mgmt. Co (In re Keegan Mgmt. Co., Sec. Litig.),* 78 F.3d 431, 434 (9th Cir. 1996). The arguments in the Defendants' briefs, unencumbered by the proper legal

---

[2] See State of North Dakota's Brief in Support of Motion for Fed.R.Civ.P.11 and 28 U.S.C. § Sanctions on page 3.

standard, therefore offer conclusion and pronouncements that lack all credibility and render the entirety of their argument a nullity.

Nor do the Complaining Defendants recognize that Rule 11 sanctions are appropriate "only in the most egregious situations, lest lawyers be deterred from vigorous representation of their clients." *United Nat. Ins. Co. v. R&D Latex Corp.,* 242 F.3d 1102, 1115 (9th Cir. 2001). Congress did not design Rule 11 as a tool of oppression and intimidation. Defendants fail to recognize the reality of the adversarial system and the Petition Clause in the First Amendment to the Constitution of the United States. The courts – and the litigants -  must ensure that its use of Rule 11 does not diminish the effectiveness of our adversary system by deterring lawyers from the "vigorous representation of their clients." *United Nat. Ins.,* 242 F.3d at 1115. See also *Schlaifer Nance & Co., Inc. v. Estate of Warhol,* 194 F.3d 323, 341 (2d Cir. 1999) ("We are cognizant of the unique dilemma that sanctions present. On the one hand, a court should discipline those who harass their opponents and waste judicial resources by abusing the legal process. On the other hand, in our adversarial system, we expect a litigant and his or her attorney to pursue a claim zealously within the boundaries of the law and ethical rules.").

### *The Standard for Imposition of Sanctions – 28 U.S.C. §1927*

Section 1927 provides in full that: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. In *In re Keegan Management Co.,* 78 F.3d 431 (9th Cir. 1996), the 9th Circuit Court of Appeals restated that a 1927 sanction cannot be applied to initial pleadings:

Because the section authorizes sanctions only for the "multipli[cation of] proceedings," it applies only to unnecessary filings and tactics once a lawsuit has begun. ***We have twice expressly held that § 1927 cannot be applied to an initial pleading***. See Zaldivar [*Zaldivar v. Los Angeles*, 780 F.2d 823, 829 (9th Cir. 1986)] 780 F.2d at 831 (under § 1927, "the multiplication of proceedings is punished, thus placing initial pleadings beyond" the section's reach) (emphasis in original); *Matter of Yagman*, 796 F.2d 1165, 1187 (9th Cir.) ("Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed."), amended, 803 F.2d 1085 (9th Cir. 1986), cert. denied, 484 U.S. 963 (1987). In case these prior holdings were insufficiently clear, we restate the rule here. The filing of a complaint may be sanctioned pursuant to Rule 11 or a court's inherent power, but it may not be sanctioned pursuant to § 1927. "For a sanction to be validly imposed, the conduct in question must be sanctionable under the authority relied on." *Cunningham v. County of Los Angeles*, 879 F.2d 481, 490 (9th Cir. 1988) (internal quotations omitted), cert. denied, 493 U.S. 1035, 107 L. Ed. 2d 773, 110 S. Ct. 757 (1990). Here it was not. The district court's imposition of sanctions under § 1927 was an abuse of discretion. (Emphasis supplied)

Presumably, Defendants' counsel thoroughly reviewed and researched the law asserted in their Motions. They knew, or should have known, that they were employing the wrong Rule 11 standard and that 28 U.S.C. § 1927 does not apply. Clearly and indisputably, Defendants brought their Motions for Sanctions *knowing* that the standard they employed is wrong; *knowing* that 28 U.S.C. 1927 does not apply; and *knowing* that the use of the appropriate standard would prove that Plaintiff's Complaint was quite well researched before it was brought against them. This is bad faith. See *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176 (9th Cir. 1988). ("'Bad faith is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.'") Id. at 1185-86 (quoting *Estate of Blas v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986)). No further discussion is needed with respect to the 28 U.S.C. §1927 claim, other than to state that Defendants'

Motions' "ad nauseam [sic]" repetition of previously offered and fully briefed arguments subjects *Defendants'* counsel to sanctions pursuant to 28 U.S.C. §1927.

### *Plaintiff's Counsel's Reasonable and Competent Inquiry into the Facts of the Case*

The Affidavits filed herewith show that Plaintiff and Counsel were aware of the following facts relative to Plaintiff's cause of action against the Consortium of States:

1. The Consortium of States began investigating Plaintiff in late 2005. At this time, counsel for Plaintiff was advised by Mr. Thomas Elden of the Oregon Department of Justice that a consortium of states ("Consortium of States") headed by the Oregon DOJ was investigating Simple.Net's check mailing marketing program.

2. Counsel for Plaintiff visited Mr. Elden in Salem, Oregon in early January, 2006. At that time, the parties discussed the check mailer and a resolution to the concern of the Consortium of States. Counsel for Plaintiff opined to Mr. Elden that the check mailer, having been approved by the Federal Trade Commission, was neither unfair nor deceptive. Counsel for Plaintiff disclosed the numerous safeguards built into the marketing strategy approved by the Arizona District Court. Mr. Elden responded with a single analogy. "There is a tattoo lady with a business close by. Suppose that she returns from the hospital and she is still under the influence of medication. She opens the check mailer from your client, Simple.Net, and without knowing that she was subscribing to Simple.Net's service, deposits the check in her business account." Counsel for Plaintiff distinctly recalls his response, "Absolutely, and she would get it."

3. Upon return to Arizona, Counsel for Plaintiff reviewed the issues raised by Mr. Elden. As it turned out, the State of Oregon does not have a consumer protection statute that would apply to Simple.Net's marketing strategy. Counsel for Plaintiff sent Mr. Elden a letter that discussed the State of Oregon's substantive concerns. The letter addressed and resolved all of the following issues and questions:

   a. Oregon DOJ did not receive any "complaints"; and

   b. Simple.Net's marketing provides five levels of consumer protection; and

   c. Simple.Net's marketing materials are 1st Amendment protected speech; and

   d. There are limits on commercial speech 1st amendment protection; and

   e. Simple.Net's speech is not made "unlawful" by Oregon legislature; and

f.  Simple.Net's speech is neither deceptive nor inherently misleading; and

g.  The form of the marketing is not misleading; and

h.  Simple.net will review the language of the materials with Oregon DOJ if there are specific objections to specific language in the marketing materials.

4.  Mr. Elden was provided with the Summary of Simple.Net's position which stated:

### Summary of Simple.Net's Position

Simple.Net provides mobile internet access to business customers for a fee of $19.95 per month.  Simple.Net's marketing method involves the mailing of a check identified as a "discount incentive" of $3.25. The cashing of the check signifies the recipient's request for Simple.Net's services; if the check is cashed, the customer is billed $19.95 per month.

In order to assure complete and robust disclosure to the potential customer, Simple.Net has adopted five levels of consumer protection:

The *first* level of consumer protection is set forth on the front of the check, describing it as "Internet Access Solicitation" and a "Discount Incentive". The *second* level of consumer protection is the clear and unambiguous statement on the back of the check, immediately above the signature line, stating that "by depositing this check and by doing so I agree to pay a fee for this service, which is only $19.95 per month". The *third* level of consumer protection is the letter accompanying the check, clearly stating the terms of the offer. The *fourth* level of consumer protection is the Order Confirmation that is issued to the customer following the acceptance of the service. The *fifth* level of consumer protection is the unconditional, no questions asked guarantee coupled with a full refund.

Statistical evidence shows that, in 2005, Simple.Net mailed 84,866 marketing packages to the businesses in Oregon. Of those,  602 (0.7%) subscribed to the service. The remaining 99.3% did not.  Of the 602 who cashed the check, 366 decided to take advantage of Simple.Net's cancellation policy and cancelled. The remaining 236, or 0.27%, became active customers.  Of the entire 84,866 pool of potential customers, there was one satisfactorily resolved Better Business Bureau complaint, and 8 satisfactorily resolved complaints directed to Simple.Net. The complaint ratio is 9,429 to 1, or 0.01%. This shows that the marketing strategy is not misleading in fact and, therefore, cannot be "inherently" misleading.  The conclusion that Oregon business are not misled are supported by the communications your office has received from concerned citizens, all of whom

-7-

profess to understand the offer but chose to reject it. E.g. communications from Courtyard Fountains; Cornutt Stears & Archibald and Attorney Post.

Simple.Net's commercial activity in the State of Oregon is protected by the 1st Amendment to the Constitution of the United States, and Article I, section 8, of the Oregon Constitution.   Simple.Net's marketing efforts are designed to be neither *de facto* deceptive, nor "inherently misleading".   I submit that Simple.Net's "experience" in the State of Oregon justifies no other finding. See, e. g., *In re R. M. J.*, infra, at 200, n. 11 (State must justify restriction in light of "experience", i.e. statistical evidence.)

Simple.Net's interest in continued commercial activities in the State of Oregon is guided by the same interests as those of the State.   Simple.Net's desire it to provide a fair service for a fair price.  If there is specific language in the marketing package that is objectionable on a constitutional basis, Simple.Net will hasten to correct it; Simple.Net invites your suggestions within the fundamental framework of marketing strategies selected by Simple.Net.

The present form of marketing has been approved by the Federal Trade Commission.

5.  However, Mr. Elden made it clear that the Consortium of States would require Simple.Net to pay a large fine and refund the money to those who subscribed to Simple.Net's services. Counsel for Plaintiff  proposed that Simple.Net (1) cease all check mailing in the future; (2) offer to Simple.Net's customers a refund of the type negotiated in the FTC matter; and (3) pay for the actual time spent on the matter by the various attorneys general.

6.  Mr. Elden, this time as many times thereafter, responded that the Consortium would require a payment of a "significant" fine.  Mr. Elden would not reveal the identity of the other members of the Consortium.

7.  The Consortium of States was aware that Simple.Net is a small company and that it did not have the financial ability to defend numerous lawsuits from numerous members of the Consortium.

8.  As a matter of applying pressure on Simple.Net to pay money to the Consortium, members of the Consortium began issuing Investigative Demands and/or Subpoenas. Without exception, these investigative demands were *ultra vires*.  Nonetheless, because Simple.Net was financially unable to defend on such many fronts, it complied with these investigative demands and subpoenas.

9.  It became apparent to Simple.Net and to Counsel for Plaintiff that the Consortium was using the investigative demands and subpoenas as a tool to unjustifiably extract money from Simple.Net.

10. Simple.Net realized that the Consortium did not care that the United States District court issued its Judgment and Order *specifically* delineating the *federally* permissible method of marketing. All that the Consortium was concerned about was money.

11. Counsel for Plaintiff and Mr. Elden engaged in numerous telephone conversations and exchanges of e-mails. It became clear to Counsel for Plaintiff that the primary motivation for the Consortium was the payment of money.

12. Upon further insistence to identify the other members of the Consortium, Mr. Elden identified the State of Texas. At the time of the disclosure of the second member of the Consortium, Counsel for Plaintiff discussed Simple.Net's offer with Mr. James Darros; the discussions normally ended with the statement that Mr. Elden needed to discuss the offer with the Executive Committee of the Consortium of States but, in any event, there would be a large and significant payment of money.

13. Counsel for Plaintiff disclosed to Mr. Elden that Simple.Net is a small company with limited financial abilities. Counsel for Plaintiff disclosed to Mr. Elden that a company such as Simple.Net had a number of moral and social responsibilities, including the responsibility to provide a safe and secure working environment to its employees:

> My client is, however, distressed by your e-mail comments to me that "Oregon is keeping an eye on your client" and that "credible expert testimony would say they [the mailers] are deceptive". When the enormity of the resources of a State are gathered against a private corporation, the private corporation becomes justifiably intimidated. When the enormity of the resources of not one, but *seventeen* states are garnered to impose their will on a private corporation, the private corporation must seek refuge in the Constitution not only for its own economic reasons, but for those who rely on it to make a living. I submit to you that Simple.Net is not a nameless, faceless villain. Simple.Net is a provider of jobs and income. Simple.Net empowers its employees to make house payments, to purchase clothing and school supplies for their children, and Similac for their babies. Simple.Net has a continuing social obligation to its employees and to the society as a whole. Please understand that your communication places my client in a significant social dilemma.

14. Mr. Elden sent to Counsel for Plaintiff a proposal that would resolve the issues. The proposal required payment of $630,000.00. (Exhibit 2)

15. The proposal was based on the Consortium of States' misapprehension of Simple.Net's marketing method.   Therefore, Counsel for Plaintiff sent to Mr. Elden a letter dated December 6, 2006 (Exhibit 3) in which Counsel for Plaintiff disclosed the differences between Simple.Net's method of marketing:

| # | | YELLOW PAGES | CYBER SPACE/Yellow-Pages.Com | SIMPLE NET |
|---|---|---|---|---|
| | **FRAUDULENT APPEARANCE ITEMS** | | | |
| 1 | Appears to be a Refund | Yes | No | **No** |
| 2 | Listed as a Rebate | No | Yes | **No** |
| 2 | Attached Form Indicates "Account Number" | Yes | Yes | **No** |
| 3 | Attached Form Indicates "Discount Taken" | No | Yes | **No** |
| 4 | Attached Form Indicates "Invoice Number" | Yes | Yes | **No** |
| 5 | Collection Agencies Employed | Yes | Yes | **No** |
| 6 | Use of Check Mailers at Time of Litigation | Yes | Yes | **No** |
| 7 | Form Resembling Invoice | Yes | Yes | **No** |
| 8 | Recipient Phone # on Check | Yes | Yes | **No** |
| 9 | Reference to "Invoice Number" | No | Yes | **No** |
| 10 | Targeting Churches | Yes | No | **No** |
| 11 | Targeting Non-Profits | Yes | No | **No** |
| 12 | Targeting Synagogues | Yes | No | **No** |
| 13 | Use of the Walking Fingers logo | Yes | Yes | **No** |
| 14 | Solicited Churches, Non Profits and Synagogues | Yes | Yes | **No** |
| 15 | Locked Customers into annual contract | Yes | Yes | **No** |
| 16. | No 800 number on solicitation/and or check | Yes | Yes | **No** |
| 18 | Multiple other offers in envelope so that consumers are unsure who the "rebate" check is coming from | Yes | Yes | **No.** |
| 19 | No Business address on solicitation and/or check | Yes | Yes | **No** |
| | **SAFEGUARDS AGAINST FRAUD** | | | |
| 13 | "Internet Access Solicitation" Disclosure on Check | No | No | **Yes** |
| 14 | 800 Number to Terminate Service On Website | No | No | **Yes** |
| 15 | 800 Number to Terminate Service On Written Materials | No | No | **Yes** |
| 16 | 90 Day Full Refund | No | No | **Yes** |
| 17 | Accompanying Letter Explains The Solicitation | No | No | **Yes** |
| 18 | Clearly Printed Restrictive Endorsement | No | No | **Yes** |
| 19 | Conspicuous Print | No | No | **Yes** |
| 20 | Full Refund Disclosure | No | No | **Yes** |
| 21 | Marketing Package Approved by District Court | No | No | **Yes** |
| 22 | Marketing Package Approved By FTC | No | No | **Yes** |
| 23 | Order Confirmation Send To Consumer Within 80 days | No | No | **Yes** |
| 24 | Refund Offer Made to Existing Customers | No | No | **Yes** |
| 25 | Staffed Call Center | NO | No | **Yes** |
| 26 | Unconditional Refund If Dissatisfied | No | No | **Yes** |

16.  Counsel for Plaintiff responded that Simple.Net did not have $630,000:

### V. PAYMENT TO SETTLING STATES

> This portion requires Simple.Net to make payment to various states in the amount of $630,000. The payment provision does not offer an explanation as to how this amount was reached, although it does state that this amount is designed as "reimbursement of litigation costs, attorney's fees, investigative costs..." This number is unreachable on two bases: First, Simple.Net cannot pay it, or anything remotely close to it. Second, $630,000 pays for 4,200 hours of attorney time, or 105 weeks of working on nothing but this case. This amount of attorney's fees is not reasonable. For example, the attorneys in the various states did not expend more than 1/5 hours each on the matter, and I do not see how your office spent more than 30 hours on this matter (distinguishing it from the work done on YP.Com). I believe that we should look at the time sheets and figure the amount of attorney's fees; I would be greatly surprised if the amount came to more than $10,000.00.

17.  Thereafter, Counsel for Plaintiff voluntarily disclosed Simple.Net's financial statements. Counsel for Plaintiff counter-offered with a lesser payment, to no avail. It was all about money.

18.  Thereafter, Simple.Net requested that Counsel for Plaintiff review legal issues relative arising out of the conflict between the United States District Court Judgment and Order and the demand by the Consortium to pay it money for conduct *specifically* permitted by the United States District Court Judgment and Order.

### *Plaintiff's Counsel's Reasonable and Competent Inquiry into Applicable Law*

The Affidavits filed herewith show that:

1.  Prior to filing suit in the matter of Dial Up Services, Inc. v. Oregon et al, Counsel for Plaintiff discussed the constitutional and legislative issues with learned Counsel for Plaintiff Thomas L. Kummer whose Affidavit is submitted herewith.

2.  Counsel for Plaintiff and Mr. Kummer have 61 years of litigation and commercial practice between them.

3.  In late 2006 and early 2007, Mr. Kummer and Counsel for Plaintiff discussed this case. Counsel for Plaintiff's discussions with Mr. Kummer regarding these matters spanned a period of more than two months and countless hours.

4.  Counsel for Plaintiff related to Mr. Kummer that despite the authority to conduct this marketing strategy granted to the Client by the Federal Judgment, various States had organized a Consortium of States with the purpose of (1) preventing Client from conducting

these sales; (2) forcing the Client to refund all income received from these sales; and (3) receiving from the Client a substantial amount of money as a "fine".

5. Mr. Kummer counseled Counsel for Plaintiff that the best advice is to attempt and settle this type of dispute if settlement can be achieved. Counsel for Plaintiff advised Mr. Kummer that Counsel for Plaintiff's Client had voluntarily ceased the marketing strategy authorized by Federal Judgment and Order and that Client had offered to send refund offers to the existing customers. However, settlement was still not possible because the Consortium of States demanded payment of a large sum of money that Counsel for Plaintiff's Client did not have.

6. Counsel for Plaintiff related that payment of a large sum of money would effectively drive Counsel for Plaintiff's Client out of business.

7. Counsel for Plaintiff and Mr. Kummer also discussed Counsel for Plaintiff's Client's duties to its employees to remain in business and to provide a safe and secure working environment.

8. Counsel for Plaintiff and Mr. Kummer discussed the possibility of filing an action in the Federal District Court to prevent the Consortium of States from interfering with the Federal Judgment and Order.

9. Counsel for Plaintiff and Mr. Kummer spent numerous hours discussing the following issues:

    b. The All Writs Act; and

    c. The Anti Injunction Act; and

    d. The Supremacy Clause in the Constitution of the United States; and

    e. The commercial speech aspects of the First Amendment to the Constitution of the United States; and

    f. The Commerce Clause of the Constitution of the United States and federal pre-emption; and

    g. The 11th Amendment immunity; and

    h. The effects of *res judicata*; and

    i. Other matters as they arose in the discussions.

19. In our discussions regarding this matter, Mr. Kummer opined that:

a. The All Writs Act provides the appropriate remedy for injunctive relief; and

b. That the exceptions to the Anti Injunction Act apply; and

c. That the Supremacy Clause in the Constitution of the United States and the Commerce Clause pre-empt the Consortium of States from enforcing remedies for conduct that had been approved by the United States District Court in a final Judgment and Order; and

d. That his Client's method of marketing was entitled to some 1st Amendment protection, unless it was unfair and deceptive.  However, since his Client's commercial speech was authorized by a Federal Judgment and Order approved by the FTC, it was *prima facie* not unfair and not deceptive; and

e. The Commerce Clause of the Constitution of the United States and federal pre-emption clearly pre-empted the Consortium of States from attacking Client's Federally approved method of marketing; and

f. The 11th Amendment immunity would immunize from a claim for damages those stats within the Consortium of States that had not waived immunity; however, Counsel for Plaintiff was unaware of any law or cases in which the question of whether the *Consortium of States*, as a conspiratorial body independent of each State's individual immunity, would be immune. Clearly, if some of the States within the Consortium of States had waived the 11th Amendment immunity; they would be subject to suit for damages.

g. The res judicata argument, although having basis in *stare decisis* was not Mr. Strojnik's Client's strongest argument.

20. Prior to commencing suit against the Consortium of States, Counsel for Plaintiff related to Mr. Kummer related that the suit on behalf of Counsel for Plaintiff's Client would be brought for injunctive relief and declaratory judgment.  Mr. Kummer opined that a suit for injunctive relief and for declaratory judgment would be appropriate in this matter.

21. Counsel for Plaintiff related to Mr. Kummer that in the prayer for relief clause he asks for damages against the Consortium of States, some of which were unknown at the time of the filing of the Complaint.  As indicated previously, it was Mr. Kummer's opinion, shared by Counsel for Plaintiff,  that the 11th Amendment may not shield a conspiratorial Consortium of States from suit for money damages where some States within the Consortium have waived the 11th Amendment and others have not.

***Plaintiff's Counsel's Reasonable and Competent Inquiry into Legal Authorities***

The Affidavits filed herewith show that:

1. Counsel for Plaintiff reviewed hundreds of reported decisions and spent at the minimum 150 hours in factual and legal research prior to commencing the present litigation.

2. Counsel for Plaintiff's factual analysis yielded the result appearing in the endnote[i].

3. Counsel for Plaintiff's legal analysis of the First Amendment issue which yielded the result appearing in the endnote[ii].

4. Counsel for Plaintiff conducted research with respect to the question of *res judicata*, which yielded the result appearing in the endnote[iii].

5. Counsel for Plaintiff reviewed law relative to the All Writs Act, a portion of which yielded the result appearing in the endnote[iv].

6. Counsel for Plaintiff conducted research with respect to the retention of jurisdiction which yielded the results appearing in the endnote[v].

7. Counsel for Plaintiff conducted research with respect to conflict pre-emption which yielded the results appearing in the endnote[vi].

8. Counsel for Plaintiff also reviewed the law relating to civil and criminal conspiracies and partnerships with respect to a claim for damages against the civil conspiracy consisting of the Consortium of States. The legal research is contained in the endnote[vii].

9. Counsel for Plaintiff also considered a count for extortion against the Consortium of States. The legal research relative to the claim of extortion appears in the endnote[viii].

***Conclusions Reached Following Reasonable and Competent Inquiry***

The Affidavits filed herewith show that:

1. After the conclusion of factual and legal research, and following discussions with Mr. Kummer, Counsel for Plaintiff concluded that a cause of action for injunction and a cause of action for declaratory judgment were well warranted by the facts and the law.

2. After the conclusion of factual and legal research, and following discussions with Mr. Kummer, Counsel for Plaintiff also concluded that the Consortium of States constituted a partnership and that, insofar as the partnership was an agreement to commit a tort, a cause of

action for damages against the Consortium of States would be an appropriate filing against the Consortium of States. However, Counsel for Plaintiff also concluded that the prudent manner of asserting a claim against the Consortium would await additional discovery that only the Consortium of States possessed.

3. The Complaint and the First Amended Complaint prepared by Counsel for Plaintiff, Counsel for Plaintiff included a claim for injunctive relief and a claim for declaratory judgment; Counsel for Plaintiff specifically omitted the conspiracy claim and the extortion claim against the Consortium of States.

## *Is The Complaint Legally And Factually Baseless?*

The Complaint is brought in two counts: Injunctive Relief and Declaratory Judgment. The Complaint does not bring the action for conspiracy and for extortion, although both actions were considered and, depending on the outcome of further discovery in this matter, may be asserted in the future.

Under a simplified notice pleading standard, the complaint contained "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). As the Supreme Court has advised, the Federal Rules "'do not require a claimant to set out in detail the facts upon which he bases his claim.'" *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Rather, the complaint must only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47.

Complaining Defendants do not argue that the US District Court Judgment and Order does not exist, or that Congress repealed the All Writs Act, or that the Anti Injunction Act does not apply. They do not argue that Plaintiff's claims are "meritless" because there is no Supremacy Clause and the pre-emption doctrine has been abrogated. They do not propose that the Complaint is frivolous because the District Court in reality did not retain exclusive

-15-

jurisdiction over Plaintiff's marketing method. Instead, their argument is best stated by the State of North Dakota:

> "As discussed <u>ad nauseam</u> [sic] in the parties' filings respecting Plaintiff's application for a temporary restraining order and in the multiple motions to dismiss, the instant action cannot possibly succeed and is simply an attempt to buy time to allow Plaintiff's [sic] to continue their conduct as long as possible and to prevent the States from engaging in discovery to determine the nature and scope of Plaintiff's conduct. ***As the States began closing in on Plaintiff, Plaintiff's counsel reacted by bringing this groundless suit, which has no legitimate purpose.***" (Emphasis supplied) State of North Dakota brief at pp 3,4.

The Affidavits filed herewith demonstrate that the Complaint is neither "frivolous," nor "legally unreasonable," or "without factual foundation".

## CONCLUSION AND PRAYEF FOR RELIEF

For the foregoing reasons Plaintiff and Plaintiff's counsel respectfully request that the Complaining Defendants' Motions for Sanctions be denied, and that the Court issue sanctions against counsel for Complaining Defendants personally for violating 29 U.S.C. § 1927 in the amount of $7,525.00.

RESPECTFULLY submitted this 29th day of May, 2007.

Peter Strojnik
Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

The original of the foregoing electronically
Filed with the Clerk of the United States District Court
For the District of Arizona this 29th day of May, 2007.



_____

# ATTACHMENT (ENDNOTES)

[i]The Federal Trade Commission brought an action against the Plaintiff herein alleging that certain "marketing and sale of Internet access services" practices were deceptive and unfair trade practice within the meaning of § 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1) (Exhibit 1). None denies that On July 30, 2001, the FTC and the Plaintiff herein entered into a Judgment and Order, Exhibit 2 ("District Court Judgment and Order"), which granted to Plaintiff the right and the privilege to conduct its marketing method subject to conditions defined in the District Court Judgment and Order. There is no dispute that the District Court retained *exclusive* jurisdiction over the matter of Plaintiff's marketing activities in the interstate commerce.

No one denies that Dial Up Services, Inc. complied fully with the District Court Judgment and Order. *See* Exhibit 3. No one disputes that Dial Up Services marketed its service only to businesses. No one disagrees that Dial UP Services adopted a five level fairness procedure to assure that every recipient was fully aware of terms of the contract[i]. No one disputes that a customer can cancel the subscription at any time within 90 days, and receive a full refund. Exhibit 4. No one questions that any customer who wants to cancel after the initial 90 day can do so, and receive a 90 day refund. Id. There is also no quarrel with the fact that Dial Up Services has not employed check mailers since November of 2005.

There is dispute, however, with the proposition that investigative demands, subpoenae and court proceedings initiated by Defendant States are designed to prosecute Plaintiff for conduct sanctioned by the District Court. State of Missouri argues that:

> The consent judgment did not address whether any sales and advertising conduct are lawful within the State of Missouri under Missouri's Merchandising Practices Act. See Response at p 7, lines 17-21.

State of Missouri's argument -- as the arguments of other Defendant States - discloses a fundamental misunderstanding of the issue. The question is not whether the marketing package sanctioned by this Court violates Missouri's Merchandising Practices Act. The question is whether the State of Missouri can (1) interfere with District Court's exclusive jurisdiction over Plaintiff's marketing; (2) interpret its own statutes in such a way that creates a conflict with the federal statute ("conflict pre-emption"); or (3) sanction Dial Up Services for conduct permitted by the District Court Judgment and Order. The question is whether Defendant States are empowered to interfere with Plaintiff's activities in interstate commerce when such activities have been adjudged appropriate by the Federal Court. The question is whether Defendant States empowered to take away from Plaintiff what the District Court Judgment and Order has given to Plaintiff. The question is whether Defendant States can initiate their own proceedings in a matter in which the District Court has retained *exclusive* jurisdiction.

The following are true facts:

1. That it has marketed in strict compliance with the District Court Judgment and Order; and
2. That it has ceased all check mailer marketing in November of 2005; and
3. That its refund policy (Exhibit 4) is strictly complied with; and
4. That it had voluntarily offered a refund to all Oregon customers; and
5. That it had less than average complaints with respect to its third party billing; and
6. That the investigations and subpoena to its vendors, such as aggregators, have the effect of increasing the reserve amounts and, potentially, terminating merchant-aggregator relationships; and
7. That the effect of investigations by Attorneys General involving merchant's vendors is irreparable and immediate; and
8. That the imposition of injunctive relief will not negatively impact the Defendant States; however, it will irreparably and immediately harm the Plaintiff.

[ii]Simple.Net's marketing method is protected speech under the rationale of *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983) and its progeny. In *Bolger*, the United States Supreme Court struck down a federal statute prohibiting the mailing of unsolicited advertisements for contraceptives under the First Amendment. In doing so, the Court set out three characteristics which, in combination, supported its conclusion that the informational pamphlets at issue constituted commercial speech, including (i) their advertising format, (ii) their reference to a specific product, and (iii)

the underlying economic motive of the speaker. *Bolger*, 463 U.S. at 67. *See also Association of National Advertisers Inc. v. Lungren*, 44 F.3d 726, 22 Media L. Rep. 2513 (9th Cir. 1994) It is undeniable that Simple.Net's marketing strategy is "commercial speech".[ii]

In regard to the permissible regulation of commercial speech, the Supreme Court in Central Hudson stated:

> In commercial speech cases . . . a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566; see also *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 815 (9th Cir. 2003) (applying the four-part *Hudson* analysis). Thus, the first inquiry is whether Simple.Net's speech is unlawful or misleading. If it is either, then the commercial speech is not protected at all by the First Amendment.

There is no express prohibition against check mailers in Oregon (or any other State). Therefore, check mailers are not "unlawful". Additionally, your office has not made any statement or allegation that the marketing material constitutes common law fraud. *See Illinois ex rel Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003) (dealing with common law fraud in the context of charitable solicitation. *See also* the trilogy *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980); *Sec. of State of Maryland v. Joseph Munson Co.*, 467 U.S. 947 (1984); *Riley v. Nat'l Fed. of the Blind*, 487 U.S. 781 (1988)

You have previously directed me to Oregon's "theft by deception" statute, O.R.S. 164.085. My previously provided analysis seems to indicate that the statute does not apply to the case at hand[ii]. You have also directed me to Oregon Consumer Protection Laws and the Oregon Racketeering statute. The Oregon Racketeering Statutes, ORS §§166.715 *et seq.* and the Unlawful Trade Practices Act, ORS §§ 646.605 *et seq.*, do not outlaw the type of marketing in issue here. These statutes do not disclose any reference to check mailers.

On the other hand, a review of relevant Oregon Supreme Court decisions confirms my understanding that restrictive endorsements are legal and enforceable in the State of Oregon. *See* the Oregon Supreme Court decision in *Edgley v. Jackson*, 276 Or 213, 554 P2d 476 (1976), where the Oregon Supreme Court expanded the rule announced in *Schumacher v. Moffitt*, 71 Or 79, 83, 142 P 353 (1914) to indicate that restrictive endorsements are enforceable not only in the context of accord and satisfaction, but in the context of other agreements. ("Although our cases have applied this general principle in the context of claims of accord and satisfaction, we see no reason why it should be limited to that context.") *Edgley v. Jackson*, 276 Or 213 at 218. *See also* ORS §§ 73.0294 et seq. (specifically authorizing restrictive indorsements).

In refining the commercial speech doctrine, the Supreme Court has distinguished between "inherently misleading" speech and "potentially misleading" speech. See *In re R.M.J.*, 455 U.S. 191, 202-203 (1982) When "advertising is inherently likely to deceive or where the record indicates that a particular form or method of advertising has in fact been deceptive," the advertising enjoys no First Amendment protection. Id. The government may ban this type of commercial speech entirely without satisfying the remaining three Central Hudson factors. Id. However, if the speech is only "potentially misleading," in other words, "if the information also may be presented in a way that is not deceptive," the speech regulation must satisfy the remaining three factors specified in Central Hudson. Id. at 203. Thus, a State may not rely on "highly speculative" or "tenuous" arguments in carrying its burden of demonstrating the legitimacy of its commercial-speech regulations. *Central Hudson* supra, at 569. Where a regulation is addressed to allegedly deceptive advertising, the State must demonstrate that the advertising either "is inherently likely to deceive" or must muster record evidence showing that "a particular form or method of advertising has in fact been deceptive," *In re R. M. J.*, supra, at 202. The State has the burden of proving that the regulation directly and proportionately remedies the deception. Where States have failed to make such showings, the Supreme Court has repeatedly struck down the challenged regulations[ii].

Available statistical evidence shows that, in 2005, Simple.Net mailed 84,866 marketing packages to the businesses in Oregon, and that of those, 602, or 0.7%, cashed the check. The remaining 99.3% did not. Of the 602 who cashed the check,

366 decided to take advantage of Simple.Net's cancellation policy and cancelled. The remaining 236, or 0.27%, became active customers. Of the entire 84,866 potential customers, there was one satisfactorily resolved Better Business Bureau complaint, and 8 direct complaints, all resolved satisfactorily. The marketing to complaint ratio is 9,429 to 1, or 0.01%. This shows that the marketing strategy is not misleading in fact and, therefore, cannot be "inherently" misleading. In the context of this statistical evidence, I do not believe that the State of Oregon can come close to enforcing a marketing restriction based on experience. See, e. g., *In re R. M. J.*, supra, at 200, n. 11 (State must justify restriction in light of "experience")

This is where we get to the meat of your objection. Your objection is not merely to Simple.Net's marketing methodology, your objection is to *any* methodology that involves a check incentive. It is the *nature* of the marketing speech to which you voice your objection. For the purposes of this discussion, I will assume, without conceding, that the *method* of marketing itself may be *speech*[ii].

As between Simple.Net and the signatory on the check, the contract is completed. The Oregon Supreme Court has made it clear that a party signing the contract is bound by the terms of the contract, irrespective of whether the person read the contract or understood its terms. *NW Pac. Indem. v. Junction City Water Dist.*, 295 Or 555, 557, 668 P2d 1206, 1208(1983) (at footnote 4); *affirmed*, NW Pac. Indem. Co. v. Junction City Water Control Dist., 296 Or. 365, 373, 677 P.2d 671, 679 (1984) The signature on the check appears immediately below the language of the contract, the language that is clear and unambiguous. As between Simple.Net and the customer, the signature constitutes the acceptance of the offer, finalizing the contract.

Your position is, however, that the State of Oregon nonetheless has a duty of protecting those who, for whatever reason, do not read the language appearing immediately above the signature. There is no indication that this has ever occurred. The only evidence we have is that the complainants, Courtyard Fountains, Cornutt Stears & Archibald, and Attorney Post, all understood the offer and rejected it.

Available statistical evidence shows that, in 2005, Simple.Net mailed 84,866 marketing packages to the businesses in Oregon, and that of those, 602, or 0.7%, cashed the check. The remaining 99.3% did not. Of the 602 who cashed the check, 366 decided to take advantage of Simple.Net's cancellation policy and cancelled. The remaining 236, or 0.27%, became active customers. Of the entire 84,866 potential customers, there was one satisfactorily resolved Better Business Bureau complaint, and 8 direct complaints, all resolved satisfactorily. The marketing to complaint ratio is 9,429 to 1, or 0.01%. This shows that the marketing strategy is not misleading in fact and, therefore, cannot be "inherently" misleading.

[iii] The district court cited Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055, modified, 444 U.S. 816, 62 L. Ed. 2d 24, 100 S. Ct. 34 (1979), in support of this determination. In Washington, the Court considered whether certain fishing groups as well as individual fishermen were bound by an earlier federal judgment entered into by the state of Washington. The Court held that because the "individuals and groups are citizens of the State of Washington, which was a party to the relevant proceedings, . . . 'they, in their common public rights as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment.'" Id. at 692-93, quoting City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-41, 2 L. Ed. 2d 1345, 78 S. Ct. 1209 (1958). The question is whether "a good faith argument," Fed. R. Civ. P. 11, can be made that this rule does not apply to a city. Although it is apparently a fairly settled rule with regard to states as sovereign representatives of their people within the federal system, see Wyoming v. Colorado, 286 U.S. 494, 508-09, 52 S. Ct. 621, 76 L. Ed. 1245 (1932); In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 131 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S. Ct. 551, 38 L. Ed. 2d 336 (1973), no case was cited to us extending this rule to municipalities.

United States v. Washington, 157 F.3d 630 (9th Cir. 1998):

> The Tribes concede that individuals may be bound by orders affecting their "common public right as citizens" in litigation to which their sovereign is a party. City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 341 (1958). A similar issue arose in Fishing Vessel, 443 U.S. at 692 n.32, where the Court concluded that non-party fishermen could be enjoined from actions interfering with the judgment of the district court. "[A] court clearly may order them to obey that judgment." Id. The Tribes' assertion that "the contemplated claims against tribal members have nothing to do with the common rights of state or tribal citizens"

-20-

therefore is without merit. On the contrary, if tribal members damage private property while exercising their fishing rights, they directly implicate their sovereigns' interests and the district court's judgment.

\*\*\*

Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 692-93 n.32, 99 S. Ct. 3055, 3078-79 n.32, 61 L. Ed. 2d 823 (1979):

> If all state officials stand by the Attorney General's representations that the State will implement the decision of this Court, see nn. 34 and 35, infra, this issue will be rendered moot because the District Court no longer will be forced to enforce its own decisions. Nonetheless, the issue is still live since state implementation efforts are now at a standstill and the orders are still in effect. Accordingly, we must decide it. In our view, the commercial fishing associations and their members are probably subject to injunction under either the rule that nonparties who interfere with the implementation of court orders establishing public rights may be enjoined, e. g., United States v. Hall, 472 F.2d 261 (CA5 1972), cited approvingly in Golden State Bottling Co. v. NLRB, 414 U.S. 168, 180, or the rule that a court possessed of the res in a proceeding in rem, such as one to apportion a fishery, may enjoin those who would interfere with that custody. See Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 641. But in any case, these individuals and groups are citizens of the State of Washington, which was a party to the relevant proceedings, and "they, in their common public rights as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment." Tacoma v. Taxpayers, 357 U.S. 320, 340-341. Moreover, a court clearly may order them to obey that judgment. See Golden State Bottling, supra, at 179-180.

\*\*\*

City Tacoma V. Taxpayers Tacoma Et Al., 78 S. Ct. 1209, 357 U.S. 320, 340-41 (1958):

> The final judgment of the Court of Appeals was effective, not only against the State, but also against its citizens, including the taxpayers of Tacoma, for they, in their common public rights as citizens of the State, were represented by the State in those proceedings and, like it, were bound by the judgment. Wyoming v. Colorado, 286 U.S. 494, 506-509; cf. Missouri v. Illinois, 180 U.S. 208, 241; Kansas v. Colorado, 185 U.S. 125, 142; s. c. 206 U.S. 46, 49; Georgia v. Tennessee Copper Co., 206 U.S. 230, 237; Hudson Water Co. v. McCarter, 209 U.S. 349, 355; Pennsylvania v. West Virginia, 262 U.S. 553, 591, 595; North Dakota v. Minnesota, 263 U.S. 365, 373.

The district court cited Washington v. Washington State Commercial Passenger Fishing Vessel Association, 443 U.S. 658, 61 L. Ed. 2d 823, 99 S. Ct. 3055, modified, 444 U.S. 816, 62 L. Ed. 2d 24, 100 S. Ct. 34 (1979), in support of this determination. In Washington, the Court considered whether certain fishing groups as well as individual fishermen were bound by an earlier federal judgment entered into by the state of Washington. The Court held that because the "individuals and groups are citizens of the State of Washington, which was a party to the relevant proceedings, . . . 'they, in their common public right as citizens of the State, were represented by the State in those proceedings, and, like it, were bound by the judgment.'" Id. at 692-93, quoting City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-41, 2 L. Ed. 2d 1345, 78 S. Ct. 1209 (1958). The question is whether "a good faith argument," Fed. R. Civ. P. 11, can be made that this rule does not apply to a city. Although it is apparently a fairly settled rule with regard to states as sovereign representatives of their people within the federal system, see Wyoming v. Colorado, 286 U.S. 494, 508-09, 52 S. Ct. 621, 76 L. Ed. 1245 (1932); In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 131 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S. Ct. 551, 38 L. Ed. 2d 336 (1973), no case was cited to us extending this rule to municipalities. The district court's order provides no authority or analysis in support of such an extension. Without purporting to decide the matter, we conclude that it is at least an arguable question whether individuals and groups are bound as privies to judgments entered into by the municipalities in which they reside. This is particularly so here where it is alleged that the municipality's entry into the stipulated judgment was a violation of state law. We conclude that the district court erred in sanctioning Moore and Hooks for arguing that Westlake was not bound by the earlier federal judgment.

See generally Washington v. Fishing Vessel Ass'n, 443 U.S. 658, 692-93, n. 32 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979) ("[These] individuals and groups are citizens of the State of Washington, which was a party to the relevant proceedings, and 'they, in their common public rights as citizens of the State, were represented by the State in those proceedings, and, like it,

were bound by the judgment.'" (quoting City of Tacoma v. Taxpayers of Tacoma, 357 U.S. 320, 340-41, 2 L. Ed. 2d 1345, 78 S. Ct. 1209 (1958)); United States v. New York, 820 F.2d 554, 558 (2d Cir. 1987) ("A state is presumed to represent the interests of its citizens . . . when it is acting in the lawsuit as a sovereign.").

iv

Congress has passed specific legislation authorizing Federal Courts to issue injunctions against state proceedings designed to infringe on federal judgments and orders. The All Writs Act authorizes the issuance of writs to protect "not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments." Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1099 (11th Cir. 2004). In United States v. New York Telephone Co., 434 U.S. 159 (1977), the Supreme Court said: "This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained . . . ." Id., at 172.   A court may grant a writ under this act whenever it is "calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it," and not only when it is "'necessary' in the sense that the court could not otherwise physically discharge its . . . duties." Adams v. United States, 317 U.S. 269, 273, 63 S. Ct. 236, 239, 87 L. Ed. 268 (1942). Such writs may be directed toward not only the immediate parties to a proceeding, but to "persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice, and encompasses even those who have not taken any affirmative action to hinder justice." United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977).

Whereas traditional injunctions are predicated upon some cause of action, an All Writs Act injunction is predicated upon some other matter upon which a district court has jurisdiction. Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1096 (11th Cir. 2004) Thus, while a party must "state a claim" to obtain a "traditional" injunction, there is no such requirement to obtain an All Writs Act injunction --it must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by some action or behavior. Id. The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because the historical scope of a court's traditional power to protect its jurisdiction, codified by the Act, and is grounded in entirely separate concerns. See United States v. New York Tel. Co., 434 U.S. 159, 174, 98 S. Ct. 364, 54 L. Ed. 2d 376 (1977) (affirming grant of injunction under the All Writs Act without regard to traditional four factors); De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 219, 65 S. Ct. 1130, 1573, 89 L. Ed. 1566 (1945) (stating, in reviewing a lower court's ruling concerning an injunction under the All Writs Act, that it is necessary to ascertain "what is the usage, and what are the principles of equity applicable in [this] case," without mentioning the traditional four injunction requirements); see also Kelly v. Merrill Lynch, Pierce, Fenner & Smith, 985 F.2d 1067 (11th Cir. 1993) (affirming grant of injunction under the All Writs Act without regard to traditional four factors), rev'd in part on other grounds Howsam v. Dean Witter Reynolds, 537 U.S. 79, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002); Keishian v. Buckley, 752 F.2d 1513 (11th Cir. 1984) (same); In re Macon Uplands Venture, 624 F.2d 26, 28 (5th Cir. 1980) (same); Teas v. Twentieth Century Fox Film Corp., 413 F.2d 1263, 1266-67 (5th Cir. 1969) (same).

The All Writs Act and the Anti-Injunction Act are closely related.  Where an injunction is justified under one of the exception's to the latter a court is generally empowered to grant the injunction under the former. Burr & Forman v. Blair, 470 F.3d 1019 (11th Cir. 2006) See also Olin Corp. v. Ins. Co. of North America, 807 F.Supp. 1143, 1152 (S.D.N.Y. 1992). Thus, in assessing the propriety of an injunction entered to stop a state court proceeding, the sole relevant inquiry is whether the injunction qualifies for one of the exceptions to the Anti-Injunction Act.

The Anti Injunction Act limits the issuances of injunctions against state court proceedings except: (1) "as expressly authorized by Act of Congress"; (2) "where necessary in aid of its jurisdiction"; or (3) "to protect or effectuate its judgments." 28 U.S.C. §2283. For purposes of the Anti Injunction Act, the term "proceedings" includes "all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process." Hill v. Martin, 296 U.S. 393, 403 (1935) (emphasis added). Obviously, this would include the issuance of subpoenae, investigative demands and preliminary orders of the type initiated by the Defendants in this cause.

Courts have upheld injunctions predicated on the "necessary in aid of its jurisdiction" exception in two distinct situations. The first is where the federal court in an in rem proceeding obtains jurisdiction over the res before the state court action involving the same res is brought.

[This is the so-called *prior jurisdiction doctrine.* 14 Charles Alan Wright et al., Federal Practice and Procedure § 3631, at 8 (3d ed. 1998). See *In re Abraham*, 421 F.2d 226, 228 (5th Cir. 1970) (holding injunction of state court proceedings proper where federal court had initial, prevailing jurisdiction over disputed property); *Jacksonville Blow Pipe Co. v. R. F. C.*, 244 F.2d 394, 399--400 (5th Cir. 1957) (upholding injunction of state proceeding seeking to replevy asset sold by trustee). Cf. *In re Am. Honda Motor Co., Inc., Dealerships Relations Litig.*, 315 F.3d 417, 439 (4th Cir. 2003) ("The 'necessary in aid of its jurisdiction' exception to the Anti-Injunction Act is widely understood to apply most often when a federal court was the first in obtaining jurisdiction over a res in an in rem action and the same federal court seeks to enjoin suits in state courts involving the same res."); 17 Charles Alan Wright, Arthur R. Miller, and Edward H. Cooper, Fed. Prac. & Proc. Juris.2d § 4225 (2d Ed. 1988).]

The 9th Circuit Court of Appeals has extended the *in rem* concept in Anti Injunction Act cases to personal rights. For example, in *United States v. Land*, 174 F.3d 1007 (9th Cir. 1999), the Court of Appeals held that a previous federal judgment concerning "water rights" was one in rem and, therefore, entitled to protection under the All Writs Act, and in *Bennett v. Medtronic, Inc.*, 285 F.3d 801 (9th Cir. 2002), the Court noted "injunctions are permitted where an in personam action bears substantial similarity to an in rem action". Such is the case here.

Orders enjoining state court proceedings have also been upheld in contexts roughly analogous to proceedings in rem, such as where enjoining the state court proceeding is necessary to protect an earlier federal court injunction. See *Wesch*, 6 F.3d at 1470 ("When a court issues an injunction, it automatically retains jurisdiction to enforce it."). This use of the exception arose frequently in the school desegregation context. See *Valley v. Rapides Parish School Bd.*, 646 F.2d 925, 943--44 (5th Cir. 1981); *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 501 F.2d 383, 383--84 (4th Cir. 1974). The exception has also been used in this manner where an injunction was necessary to protect and effectuate complicated judgments over which the federal court had retained jurisdiction. *Wesch*, 6 F.3d at 1470--71 (enforcing court-ordered redistricting); *Battle v. Liberty Nat. Life Ins. Co.*, 877 F.2d 877, 880--82 (11th Cir. 1989) (enforcing complex anti-trust judgment).

The third exception to the Anti-Injunction Act authorizes a federal court to issue an injunction to, "protect or effectuate its judgments." 28 U.S.C. § 2283. This exception is generally referred to as the "relitigation exception." See *Jacksonville Blow Pipe*, 244 F.2d at 400. An injunction under the relitigation exception is appropriate where the state law claims would be precluded by the doctrine of res judicata. See *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1104 (11th Cir. 2004) ("Proceedings in other courts that involve the same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction"); *Wesch*, 6 F.3d at 1471 ("[The relitigation exception] is essentially a res judicata concept designed to prevent issues that have already been tried in federal court from being relitigated in state court.").

Proceedings in other courts that involve the same facts as already issued judgments and orders, or that could result in the issuance of an inconsistent judgment, threaten the jurisdiction of the district court enough to warrant an injunction. See, e.g., *Teas v. Twentieth Century Fox Film Corp.*, 413 F.2d 1263, 1266-67 (5th Cir. 1969) ("We cannot permit the prior [federal court] judgment to be rendered null and void through the ingenious expedient of a declaratory judgment [action in state court] concerning a different term of the same contract."). See also *Burr & Forman v. Blair*, 470 F.3d 1019 (11th Cir. 2006) for general discussion on the subject.

There is a third scenario in which the enjoining of a state court proceeding might be necessary and thus permissible. Called the "complex multi-state litigation" exception, it enables a district court to enjoin a state court proceeding in aid of its jurisdiction when it has retained jurisdiction over complex, in personam lawsuits. *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233 (11th Cir. 2006) In *Battle v. Liberty National Life Insurance Co.*, 877 F.2d 877 (11th Cir. 1989), the 11th Circuit Court of Appeals reviewed a district court order enjoining the plaintiffs in three state court proceedings from pursuing claims that were substantially similar to those claims settled by final judgment in a federal antitrust class action lawsuit. *Battle* was a complicated and protracted legal dispute between a funeral insurance provider and certain burial and/or vault insurance policy holders, in which the court certified two classes under Rule 23(b)(2) and 23(b)(3). After seven years of litigation in both state and federal court, the parties reached a settlement. "The final judgment established the rights and obligations of about 300 owners of some 400 funeral homes . . . and the rights . . . of approximately 1 million policyholders." *Battle*, 877 F.2d at 880. The court expressly retained jurisdiction over the case to resolve any future disputes amongst the settling parties regarding the settlement terms. Id. After entry of final judgment, three different sets of policyholders initiated other class actions in state court involving the issues the federal settlement had resolved.

-23-

The Court in *Battle* upheld the district court's permanent injunction of the state court proceedings because the "state court suits, class actions which on their face challenge the propriety of the Battle judgment, can only undermine the district court's continuing jurisdiction over the case." Id. at 881. Put another way, contradictory state court judgments, purporting to bind substantially the same litigants on substantially similar claims, would only confuse the parties as to their legally enforceable rights and obligations. *In re Bayshore Ford Trucks Sales, Inc.,* 471 F.3d 1233 (11th Cir. 2006) The purpose of the district court's judgment -- to determine definitively the rights and obligations of the parties -- would have been frustrated, and all of the time and effort put into producing that resolution wasted. The Court observed that "it makes sense" to consider so complicated a case, in which both the court and the parties had invested considerable time and resources, like a "res to be administered." Id. at 882.

The same conclusion was reached in *Wesch,* a case involving an Alabama congressional redistricting plan administered by a three-judge court. After the court entered final judgment adopting the plan, a class action was filed in an Alabama circuit court on behalf of substantially the same plaintiffs asserting substantially the same claims as those before the district court. *Wesch,* 6 F.3d at 1468--69, 1470. The district court enjoined the state court proceedings in aid of its jurisdiction and to effectuate its judgment. Relying on the reasoning in *Battle,* the Court of Appeals concluded that the federal case should be treated like a *res* for Anti-Injunction Act purposes because "the three-judge district court . . . invested a great deal of time and other resources in the arduous task of reapportioning Alabama's congressional districts." Id. at 1471. All of that effort would have been wasted if the state court proceedings were allowed to supplant the district court's final judgment. "To allow a system of redistricting at will would render all federal court redistricting plans, regardless of their validity, susceptible to immediate replacement by state court redistricting plans . . . and would effectively strip all federal courts of the ability to meaningfully redistrict." Id.

The exception recognized in *Wesch* and *Battle* is predicated on both complexity and potential for interference. The complexity and the potential for interference are equally present here:  There are potentially 30+ states ready to initiate their own litigation against Plaintiff for conduct sanctioned by the Federal Judgment and Order.

[v] In *Badgley v. Santacroce,* 800 F.2d 33 (2nd Cir. 1986), the court considered whether a consent judgment entered in Federal Court between the inmates at the Nassau County prison and the Nassau County Sheriff regarding the maximum in-house population of the inmates at the jail.

The County defendants breached the consent judgment, and the inmates filed for contempt. The District Court judge denied the contempt application on the basis that the compliance with the Federal Consent Judgment would violate State Law. (If the sheriff refused the prisoners sent to him for housing, the Sheriff would be in contempt of the court sentencing the prisoner.)  The Court of Appeals reversed, stating:

> Even if a state court would hold the defendants in contempt for refusing to house inmates at the NCCC, or if compliance would otherwise violate state law, Supremacy Clause considerations require that the judgment of the federal court be respected. *Washington v. Washington State Commercial Passenger Fishing Vessel Association,* 443 U.S. 658, 695, 61 L. Ed. 2d 823, 99 S. Ct. 3055 (1979); see *Cooper v. Aaron,* 358 U.S. 1, 3 L. Ed. 2d 5, 78 S. Ct. 1401 (1958); *Ableman v. Booth,* 21 How. (62 U.S.) 506 (1859). ***In any attempt by a state court to hold defendants in contempt for taking actions required by the judgment of the District Court, that judgment would provide a complete defense.*** (Emphasis added)

[vi] In normal preemption cases, the Court apply the familiar analysis set forth by the Supreme Court in *English v. General Electric Co.,* 496 U.S. 72 (1990). There are three forms of federal preemption -- express, field, and conflict. "First, Congress can define explicitly the extent to which its enactments pre-empt state law." *English,* 496 U.S. at 78. "Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." Id. at 79. "Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, and where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Conflict Pre-Emption arises in the absence of specific preemption language, where an individual is unable to follow both federal and state laws simultaneously, or where the state law "would frustrate the federal scheme." *Allis-Chalmers Corp. v. Lueck,* 471 U.S. 202, 209 (1985); see also *English,* 496 U.S. at 79 ("where state law

-24-

stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). "Federal and state law need not be contradictory on their faces for preemption to apply. It is sufficient that the state law 'impose[s] . . . additional conditions' not contemplated by Congress." *Sperry v. Florida*, 373 U.S. 379, 385 (1963)) A conflict will be found "where compliance with both federal and state regulations is a physical impossibility . . .," Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-143, 83 S. Ct. 1210, 1217, 10 L. Ed. 2d 248 (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941)

In the case at bar, the District Court Judgment and Order granted to Plaintiff a right to market its services in the interstate commerce subject to certain well defined conditions. Plaintiff complied with the conditions. Under the Supreme Court holding in *Sperry* and Hines, the Defendant States cannot impose any additional requirements, and should be enjoined from doing so.

[vii] 29-1011. Partnership as entity

A. A partnership is an entity distinct from its partners.

B. A limited liability partnership is the same entity that existed before the filing of a statement of qualification under section 29-1101.

29-1012. Formation of partnership

A. Except as otherwise provided in subsections B and C, the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership.

B. An association formed under a statute other than this chapter, a predecessor statute or a comparable statute of another jurisdiction is not a partnership under this chapter.

C. In determining whether a partnership is formed, the following rules apply:

1. Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property, except that the ownership establishes a partnership if the persons have declared in a written partnership agreement that the property is partnership property subject to the provisions of the partnership agreement and this chapter.

2. The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived.

3. A person who receives a share of the profits of a business is presumed to be a partner in the business, unless the profits were received in payment either:

(a) Of a debt by installments or otherwise.

(b) For services as an independent contractor or of wages or other compensation to an employee.

(c) Of rent.

(d) Of an annuity or any other retirement benefit to a beneficiary, representative or designee of a deceased or retired partner.

(e) Of interest or other charge on a loan, even if the amount of payment varies with the profits of the business, including a direct or indirect present or future ownership of the collateral, or rights to income, proceeds or increase in value derived from the collateral.

(f) For the sale of the goodwill of any business or other property by installments or otherwise.

*Turley v. Ethington*, 213 Ariz. 640, 146 P.3d 1282 (App.2006)

"For a civil conspiracy to occur two or more people must agree to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means, causing damages." Baker v. Stewart Title & Trust of Phoenix, 197 Ariz. 535, 542, 5 P.3d 249, 256 ¶30 (App. 2000) (quoting Rowland v. Union Hills Country Club, 157 Ariz. 301, 306, 757 P.2d 105, 110 (1988)); see also RESTATEMENT (SECOND) OF TORTS § 876. "A mere agreement to do a wrong imposes no liability; an agreement plus a wrongful act may result in liability." Baker at 542, 5 P.3d at 256 (citations omitted). In short, liability for civil conspiracy requires that two or more individuals agree and thereupon accomplish "an underlying tort which the alleged conspirators agreed to commit." Id. at 545, 5 P.3d at 259. Here, the underlying wrong is Symington's fraud via submission of fraudulent financial statements to the Funds. The Bank denies any agreement to defraud.

*Wells Fargo Bank v. Arizona Laborers*, 201 Ariz. 474, 38 P.3d 12 (Ariz. 2002)

A Sherman Act conspiracy is a partnership in crime that continues until all its objectives have been accomplished or abandoned. See United States v. Kissel, 218 U.S. 601, 607-08, 31 S. Ct 124, 126, 54 L. Ed. 1168 (1910) ("A conspiracy to restrain or monopolize trade by improperly excluding a competitor from business contemplates that the conspirators will remain in business, and will continue their combined efforts to drive the competitor out until they succeed.") ("A conspiracy is a partnership in criminal purposes . . . . [and] an overt act of one partner may be the act of all without any new agreement specifically directed to that act."). Accord *North Carolina v. Brewer*, 258 N.C. 533, 129 S.E.2d 262 (N.C. 02/01/1963); *United States v. Robertson*, 473 F.3d 1289 (10th Cir. 2007); United States v. Littlefield, 594 F.3d 682, 684 (8th Cir. 1979); Wilson-Bey v. United States, No. 01-CF-293 (D.C. 07/20/2006)

"A conspiracy is a partnership in crime[,]" and "has ingredients, as well as implications, distinct from the completion of the unlawful project." Pinkerton v. United States, 328 U.S. 640, 644 (1946) (internal citations omitted). "[T]he essence of any conspiracy is 'the agreement or confederation to commit a crime.'" United States v. Hanson, 41 F.3d 580, 582 (10th Cir. 1994) (quoting United States v. Bayer, 331 U.S. 532, 542 (1947)); see also United States v. Bicaksiz, 194 F.3d 390, 398 (2d Cir. 1999) (noting, with regard to a conviction for conspiracy to violate 18 U.S.C. § 1958, that "[a]n essential element of the crime of conspiracy is an agreement"). Moreover, "[c]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself." Ingram v. United States, 360 U.S. 672, 678 (1959).

A criminal conspiracy is a partnership of two or more individuals that "have voluntarily agreed to effectuate the commission of a criminal offense." People v Justice (After Remand), 454 Mich 334, 345; 562 NW2d 652 (1997). The individuals must have specifically intended to combine to further, promote, or advance an unlawful objective because the essence of the crime of conspiracy is the unlawful agreement itself. Id. at 345-347. The unlawful agreement is defined by the scope of the commitment of the conspirators. Id. at 347-348. Conspiracies have a temporal dimension and continue until they are completed, abandoned, or terminated. People v Bushard, 444 Mich 384, 394; 508 NW2d 745 (1993). "An arrest generally terminates the conspiracy, as does the success or failure of its objectives." Id.

[viii] In MacCollum v. Perkinson, 913 P.2d 1097, 185 Ariz. 179, 211 Ariz. Adv. Rep. 44 (Ariz.App.Div.1 03/05/1996), the Court recognized a private cause of action for securities registration pursuant to A.R.S. § 44-1841 because it is a predicate offense to a racketeering cause of action:

Count Two of the proposed second amended complaint alleges violations of the securities registration statute, A.R.S. section 44-1841 (1994). The statute does not explicitly grant a private cause of action for its violation. Nevertheless, section 44-1841 is a predicate offense for a violation of the racketeering statute, A.R.S. section 13-2314(A) (1989). Because the racketeering laws, specifically section 13-2301(D)(4)(s) (1989), provide for a private cause of action, we think it is implicit that a private cause of action exists for violation of section 44-1841.

Insofar as extortion is also a predicate offense, it provides a private cause of action.